ELLIOTT ROBBINS AND JERSEY CITY ASSOCIATION FOR THE SEPARATION OF CHURCH AND STATE, PLAIN-TIFFS-APPELLANTS, v. CITY OF JERSEY CITY, A MUNICIPAL CORPORATION, *ET ALS.*, DEFENDANTS-RESPONDENTS.

Argued December 3, 10, 1956—Decided January 21, 1957.

230

*Mr. Aaron Marder* argued the cause for the plaintiffs-appellants.

*Mr. James F. X. O'Brien* argued the cause for the defendant-respondent Seton Hall College of Medicine and Dentistry (*Messrs. James F. X. O'Brien* and *James P. Mylod,* attorneys).

*Messrs. McCarter, English & Studer,* attorneys for defendant-respondent George A. Fuller Co. (*Mr. Augustus C. Studer, Jr.,* of counsel).

*Mr. James A. Tumulty, Jr.,* Corporation Counsel of the City of Jersey City, attorney for defendant-respondent City of Jersey City (*Mr. Francis X. Hayes,* Assistant Corporation Counsel, of counsel).

*Mr. Frederick J. Gassert,* Hudson County Counsel, attorney for defendant-respondent County of Hudson (*Mr. Lewis B. Eastmead,* Assistant County Counsel, of counsel).

The opinion of the court was delivered by

BURLING, J. The instant complaint in lieu of prerogative writ sought to attack the validity of certain leases negotiated between defendants. City of Jersey City and Seton Hall College of Medicine and Dentistry, a body corporate of this State and an educational institution. Following entry of summary judgment for the defendants the plaintiffs pursued an appeal in the Superior Court, Appellate Division, and we certified the cause prior to a review below.

Jersey City owns and operates a large Medical Center. It is a vast physical plant consisting of ten main buildings. The financial burden attending the operation of the center has not been a light one. Enormous "yearly deficits" have been the rule without exception.

Early in 1954 the city officials caused a study to be made, the end in view being to economize the operation through consolidation of services into compact building units. The facilities of the Center were in excess of the public requirements. Inefficiency resulted by spreading the operation throughout the numerous buildings rather than concentrating the use to an area proportionate to the need. Heating and maintenance of an entire building proved unwarranted where only half the building was in use.

By effecting a consolidation of the operation it was thought that the large Clinic building might be vacated and leased. The city was interested in renting this 16 story structure to a public or private interest which would use the facility as a medical and dental school. There had been previous

attempts to lease a part of the center to the Federal and State Governments for this purpose. With this project in mind the city, through public advertisement, invited any duly accredited college or university to submit proposals for the use of the Clinic building as a medical and dental school. A prospectus was compiled and distributed to interested parties.

There were responses to the invitation. Among them was that of Seton Hall College of Medicine and Dentistry. Negotiations were entered into between this institution and the city which resulted in the entire Clinic building being leased to the college for a term of 50 years at an annual rental of $275,000.

The date of the Clinic building lease was December 10, 1954. On the following December 16 a complaint in lieu of prerogative writ was filed by one John Gimenez, a taxpayer of Jersey City, attacking the validity of the lease. Gimenez was the nominee of a group called the "Jersey City Fact Finding Committee" which sponsored and paid for the suit.

The complaint in the Gimenez suit sought to have the lease voided on several grounds: absence of competitive bidding, inadequate consideration, and a charge that the Clinic building was presently needed for a public use. The suit ended in a summary judgment for the city and college and no appeal was taken. A further charge that the city was illegally delegating the management and operation of the Medical Center to a sectarian institution (the college being associated with the Roman Catholic Church) was, in effect, dismissed without prejudice for the reason that the city and the college had not entered a management agreement although the lease contemplated a working accord for the management of or the rendition of professional services to the Center.

Following the termination of the Gimenez action the city sought to interest the college in surrendering three floors of the Clinic building and to accept in lieu thereof an equal amount of space in the nearby Isolation building

which at the time was completely vacant. This plan, the record advises, would save the city an estimated expenditure of some $300,000 in transferring the out-patient clinics from the Clinic building to other buildings and would also serve to benefit both patients and students alike if the clinics were operated in the same building as the medical school. It was proposed that the Isolation building be used as the dental school and the city would reserve space there for a dental clinic. This suggestion was the subject of negotiation between the respective parties, the college at first rejecting the overture. Finally, on November 28, 1955, the change in plan was effected by a lease of a portion of the Isolation building to the college and a release by the latter of the first three floors of the Clinic building.

The college authorities geared their plans to the fall of 1956 as the opening date for classes. Renovations were commenced in December 1955, and by February 1956 the cost of alterations had reached $187,000. The architectural firm submitted a bill on account for $50,000. The college obligated itself for laboratory equipment in a sum over $200,000, and clerical and administrative expense approximated $50,000.

The instant complaint was filed on February 8, 1956, sponsored by the same interests who underwrote the Gimenez suit but now incorporated as the Jersey City Association for the Separation of Church and State. The present attack presents the same contentions raised in the Gimenez suit but now has two targets—the Clinic building lease and the Isolation building lease. Defendants did not file an answer but moved for summary judgment with supporting affidavits. Plaintiffs filed a cross-motion for summary judgment. The trial court gave judgment to defendants, generally upon the ground that the Gimenez suit was *res judicata* as to the lease of the Clinic building and that the same decision had a *stare decisis* effect upon the validity of the Isolation building lease. The question of whether the city was illegally delegating management control of the medical center to a sectarian institution, which is plaintiffs' principal cause of

concern, was again thought to be premature inasmuch as no management agreement had yet been resolved.

On this appeal plaintiffs contend the leases to be void (1) for lack of advertising and competitive bidding; (2) because the declaration by resolution that the buildings are not needed for a public use is untrue; (3) because the consideration received for the leases was inadequate, thereby constituting a municipal gift in violation of *N. J. Const.* 1947, *Art.* VIII, *Sec.* III, *pars.* 2 and 3. The charge that the city is illegally delegating the management of the Medical Center is renewed, and the constitutionality of *L.* 1955, *c.* 22 (*N. J. S. A.* 30:9–23.6 *et seq.*), providing for various types of hospital affiliation agreements between governmental bodies and colleges of medicine and dentistry, is attacked. Defendants' position is simply to raise a bar to these charges through invocation of *res judicata,* estoppel and laches, and the 30 day rule of the in-lieu procedure. They insist the issue of a management contract is still premature.

It is necessary to consider three basic questions in the disposition of this appeal:

1—Was advertising and competitive bidding required in the execution of these leases?

2—Is there a procedural bar which would foreclose consideration of questions going to the adequacy of the monetary consideration and the alleged public need for retaining these buildings for municipal hospital services? And, if not, do the supporting affidavits on the motions for summary judgment present a genuine issue of fact on these matters?

3—Are the issues surrounding a management agreement and the constitutionality of *L.* 1955, *c.* 22 premature?

(Initially it may be noted that the defense of *res judicata* pertains only to the lease of the Clinic building by virtue of the former Gimenez suit. Defendants concede there is no *res judicata* effect attributable to the lease of the Isolation building. Both leases are inseparably intertwined from a factual aspect. Because the case is resolved upon other grounds in favor of the defendants it is not necessary or essential to consider the sufficiency of this defense.)

QUESTION 1.

█ Jersey City contends the instant leases were executed under the authority of *R. S.* 40:176–11 which empowers "first class cities" to lease any land or building not needed for public use for a term not exceeding 50 years. The statute in terms does not require advertisement and competitive bidding. Plaintiffs argue that *R. S.* 40:60–26 and 42, originating in the Home Rule Act, *L.* 1917, *c.* 152, supply the necessary procedural steps which require public competition. They strongly rely upon our decision in *Asbury Park Press v. City of Asbury Park,* 19 *N. J.* 183 (1955).

*Asbury Park Press* is not controlling. There we were dealing with a particular type of municipal property, *i. e.,* public parks, recreation grounds or place of public resort which had received special statutory treatment. *R. S.* 40:61–36 (*L.* 1937, *c.* 172); *R. S.* 40:61–1(*g*) and (*h*) (*L.* 1917, *c.* 152, *Art.* XXXVI, *sec.* 13, as am. *L.* 1933, *c.* 355, *sec.* 1). The holding was that these aforementioned enactments (which required advertisement and competitive bidding) were to be read *in pari materia* with *R. S.* 40:179–116 which did not in terms require that procedure.

The question remains, however, whether plaintiffs are correct in stating that *R. S.* 40:60–26 and 42 require adherence to a bidding procedure and if so, the effect of these statutes upon the first-class city provision, *R. S.* 40:176–11.

In *Waring Realty Co. v. Murphy,* 125 *N. J. L.* 360 (*Sup. Ct.* 1940) the former Supreme Court recognized that *R. S.* 40:176–11 fixed no particular form for the exercise of the leasing power. See also *Child v. Board of Comm'rs of City of Newark,* 8 *N. J. Misc.* 597 (*Sup. Ct.* 1930). *R. S.* 40:60–42, originating in the Home Rule Act of 1917, empowers every municipality to lease unneeded property to one who will pay the "highest rent therefor," but the decision in *Asbury Park Press, supra,* 19 *N. J.,* at *page* 192, noted that bidding was not expressly required under that statute. *R. S.* 40:60–26, as am. *L.* 1948, *c.* 245, also originat-

ing in the Home Rule Act, concerns the sale of lands or buildings not needed for public use "or any right or interest therein." The latter statute provides several methods of negotiating disposition of public property, all geared to manifest the best interest of the municipality. Two methods require advance advertising.

The crucial inquiry is whether the lawmakers intended a sale of "any right or interest therein" (*R. S.* 40:60–26) to encompass a lease of public property. It may be fairly argued that *R. S.* 40:60–42 as well as *R. S.* 40:176–11 merely define a basic power, and that *R. S.* 40:60–26 denominates the procedure to be followed. This interpretive possibility, used in a different statutory context, was a major factor in *Asbury Park Press, supra,* 19 *N. J.,* at *page* 197. Plaintiffs have not traced their argument to this point of inquiry and we feel it unnecessary to decide the matter at this time.

We discern from the record that the desire of Jersey City to effect a lease of a portion of the Medical Center to an educational institution which would bring New Jersey its first medical school was well known. Proposals were invited through advertisement in many newspapers. Extensive renovations were undertaken following the disposition of the Gimenez suit and, as previously noted, Seton Hall College had invested a large sum of money in this undertaking by the time the present plaintiffs saw fit to challenge the legality of the program. Here the power of lease was within Jersey City's essential jurisdiction by virtue of statute, *R. S.* 40:176–11. Any arguable defect in the procedure of negotiation, if indeed advertising and competitive bidding were required, is foreclosed from attack by the plaintiffs for their failure to promptly present their case which would have served as a warning signal to the college in the huge expenditure involved in a project of such magnitude. See *Summer Cottagers' Ass'n of Cape May v. City of Cape May,* 19 *N. J.* 493 (1955). Further, the complaint was filed more than 60 days following the accrual of the right which stemmed from the execution of the Isolation building lease. Plaintiffs do not contend that they were uninformed of this event.

*R. R.* 4:88–15(*a*) required action within 30 days of the accrual of the right and the defendants are entitled to the protection of the rule.

## QUESTION 2.

Plaintiffs contend that the 30-day limitation of *R. R.* 4:88–15(*a*) does not preclude a meritorious consideration of the alleged inadequacy of the yearly rental under the leases because if the charge is sustained a constitutional prohibition against gifts by municipalities is violated. *N. J. Const.* 1947, *Art.* VIII, *Sec.* III, *pars.* 2 and 3; see *Jamouneau v. Local Government Board,* 6 *N. J.* 281 (1951). Similarly, it is said that because the two buildings were in fact needed for a public use the leases are completely void as *ultra vires* the municipal power.

We have recognized that the time limitations on the in-lieu procedure may not apply where substantial constitutional questions are raised. *Holloway v. Pennsauken Township,* 12 *N. J.* 371 (1953); *McKenna v. New Jersey Highway Authority,* 19 *N. J.* 270 (1955). The doctrine of estoppel may be applicable, however, *In re Buckeye Pipe Line Co.,* 13 *N. J.* 385 (1953). An inquiry of considerable importance is the measure and nature of the actor's reliance which has been placed upon the non-action of the party who brings the belated challenge; and so far as a municipal body is concerned it is significant for purposes of estoppel to examine the basic jurisdiction relied upon. Compare *V. F.' Zahodiakin Engineering Corp. v. Zoning Board of Adjustment of City of Summit,* 8 *N. J.* 386 (1952), with *Summer Cottagers' Ass'n of Cape May v. City of Cape May, supra.* But see *Marini v. Borough of Wanaque,* 37 *N. J. Super.* 32, 40–41 (*App. Div.* 1955). The general proposition that exceptions to the time limitations imposed upon the in-lieu procedure should be but exceptionally condoned, and only in the most persuasive circumstances, remains the same. Consider *R. R.* 1:27B(*d*). See the provocative editorial note at 10 *Rutgers L. Rev.* 673 (1956). The attainment of

substantial justice in particular cases should not be interpreted as dilution of the principle. For example, the fact that plaintiffs have also sought injunctive relief in the instant matter does not persuade us that the 30-day limitation should not be applicable. Compare *Thornton v. Village of Ridgewood,* 17 *N. J.* 499, 508–510 (1955).

Invocation of time limitations in the instant case will not preclude substantial justice, for any supposed merit to the plaintiffs' cause of action was stripped of significance when their position was revealed on the cross motions for summary judgment.

The two allegations raised in the complaint which might have been the focal point for a genuine factual dispute were the charges of inadequate consideration and untruth in the conclusion of the city's governing body that the buildings were not needed for a public use. Defendants filed no answer but gave notice of motion for summary judgment with supporting affidavits.

These moving papers pointed out that the operation of the Medical Center resulted in enormous yearly deficits. In 1954, when the Clinic building was leased, the city was using but eight floors of this 16-story structure. The Isolation building was completely vacant when it was declared unneeded for public use. The record states that the subsequent reshuffling of lease accommodations whereby the city retained three floors of the Clinic building to house the outpatient clinics obviated an expenditure of $300,000 in moving and installation costs. From this it can hardly be concluded that the Clinic building was in fact essential to the public use. Nor are we free to state unequivocally that a consideration of $275,000 annual rental is *per se* inadequate. It is a return which the city would not otherwise have realized through a continued municipal operation.

Plaintiffs filed a cross-motion for summary judgment. The only moving paper having any relevance here is that of George G. Hollingshead, the president of the Jersey City Association for the Separation of Church and State. Based upon "information and belief" the affidavit alleges that the

Clinic building has a value of $3,000,000 and that the city, after performing certain obligatory services under the lease, will net no more than $125,000 annually; that the dental clinic in the Medical Center has been closed and the psychiatric facilities have been removed to another location. The source of the information is not revealed and we have no other alternative but to place it in the category of hearsay, and thus it is insufficient to oppose defendants' motion for summary judgment. *R. R.* 4:58-6; see *Ash v. Frazee,* 37 *N. J. Super.* 542, 547-548 (*App. Div.* 1955).

The Hollingshead affidavit also alleges that the matters set forth therein are peculiarly within the knowledge of the officials of Jersey City and the college. In certain situations there may be reason to be solicitous of this factor. See, *e. g., Monmouth Lumber Co. v. Indemnity Ins. Co. of North America,* 21 *N. J.* 439 (1956). This is not always the case. *R. R.* 4:58-7 provides:

"Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may deny the motion or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had, or may make such other order as is just."

Denial of a motion for summary judgment is not required where something more than hearsay opposition might well have been developed through additional affidavits or the taking of depositions, thereby engendering a genuine factual dispute. See *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N. J.* 67, 76 (1954).

The summary judgment procedure, *R. R.* 4:58, brings two opposing philosophies of the judicial process into focus. On the one hand is the desire to afford every litigant who has a *bona fide* cause of action or defense the opportunity to fully expose his case. In support of this philosophy our appellate courts have taken the position that summary judgments are to be cautiously granted, *Devlin v. Surgent,* 18 *N. J.* 148, 154 (1955), and the party opposing the motion indulgently treated by resolving all doubts in favor of trial,

*West Side Trust Co. v. Gascoigne,* 39 *N. J. Super.* 467, 470 (*App. Div.* 1956).

On the other hand, protection is to be afforded against groundless claims and frivolous defenses, not only to save antagonists the expense of protracted litigation but also to reserve judicial manpower and facilities to cases which meritoriously command attention. See, generally, *Asbill and Snell, "Summary Judgment Under the Federal Rules— When an Issue of Fact is Presented,"* 51 *Mich. L. Rev.* 1143, 1143 to 1145 (1953).

It is often difficult to foster the necessary balance between these opposing principles. Where, however, a *prima facie* right to a summary judgment exists, neither principle is sacrificed in requiring the party opposing the motion for summary judgment to demonstrate by competent evidential material that a genuine issue of fact exists, or, where this is impossible within the time allowed, to seek a continuance of the motion for the purpose of submitting additional affidavits or depositions. Accord, *Taub v. Taub,* 9 *N. J. Super.* 219 (*App. Div.* 1950); *Evans v. Rohrbach,* 35 *N. J. Super.* 260, 268–269 (*App. Div.* 1955); certification denied *Evans v. Matthews,* 19 *N. J.* 362 (1955); *VanDyke v. Carol Building Co.,* 36 *N. J. Super.* 281, 287–288 (*App. Div.* 1955). It should be a rare case where nothing whatsoever is submitted to contest the motion. See *Asbill and Snell, supra,* 51 *Mich. L. Rev.,* at 1165–1166.

Here the Hollingshead affidavit did not measure up to the evidential standard required by *R. R.* 4:58–6 and plaintiffs did not request a continuance for the purpose of substantiating their charge of inadequate consideration or that the leased property was needed for a public use. The appropriate time to make a request for continuance is at the very outset of the hearing on the motion by an unequivocal statement to that effect. Here, however, plaintiffs' counsel informed the trial court that he was prepared to argue the summary judgment issue at any time, and the theory of the presentation was that defendants' motion should be denied and plaintiffs' motion granted. At one stage of

the argument it was suggested that plaintiffs had not had time to substantiate their allegations by taking depositions of the city and college officials, but little countenance can be given to this utterance, coming as it did after counsel had previously and categorically advised the court that deposition of the motions was in order.

We conclude that entry of summary judgment on defendants' motion therefor was properly granted, not only in view of procedural limitations but also because no genuine factual dispute existed upon the matter which might arguably have overcome the 30-day rule.

### QUESTION 3.

██ The main thrust of plaintiffs' case and apparently their chief concern is the belief that certain religious dogmas of the Roman Catholic Church will be manifested in the operation of the city's clinics should management of these public facilities be delegated to the college. This anxiety has led to the allegation that the city is illegally delegating the management and operation of the Medical Center to the college.

Clearly the lease contemplates a working accord between the city and the college in the management of or the rendition of medical services to the Medical Center. For example, paragraph 20 of the Clinic building lease provides:

"20. It is further understood and agreed that if, at any time after the commencement date of this lease, there should fail to exist an agreement between City and College, providing for the management by College of the Jersey City Medical Center, or providing for professional services to be rendered by College to the Jersey City Medical Center, then and in that event College shall have the option to terminate this lease by giving ninety (90) days' notice in writing to City of its intention to so terminate for the aforesaid reason, and if within said 90 day period City and College shall not enter into an agreement as aforesaid, satisfactory to both City and College, then on the tenth day following said 90-day period this lease and the term thereof shall expire and come to an end."

The moving papers of defendants in support of their motion for summary judgment and the representation of counsel

established that no management agreement has been entered. The purported issue is thus premature and there is no occasion to presently consider the matter. For the same reason it is unnecessary to presently assay the constitutional validity of *L.* 1955, *c.* 22 (*N. J. S. A.* 30:9–23.6) which provides for various types of hospital affiliation agreements between governmental bodies and schools of medicine and dentistry. It is sufficient to state that if such an agreement is reached it will not be beyond the pale of judicial review as to any constitutional questions which plaintiffs may conceive to be present. The defendants have been fully aware of the plaintiffs' concern on this point ever since the Gimenez suit.

The judgment will be affirmed for the reasons stated in this opinion.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and WEINTRAUB—7.

*For reversal*—None.