BRENNAN, J.T.C.
The plaintiffs (“Comcast”)[1] in these consolidated matters are providers of cable television service in New Jersey. Comcast has filed a summary judgment motion challenging the use tax assessment of the defendant, Director, Division of Taxation (“Director”) *82 with regard to converters* [2] and remotes, as well as the assessment of underpayment and amnesty penalties. Comcast contends that the converters and remotes were exempt from taxation pursuant to N.J.S.A 54:32B-8.13(e) because they were primarily and directly used in the transmission of television information. Comcast also argues that it should not be responsible for any underpayment penalties or amnesty penalties because of confusion and ambiguity regarding the tax liabilities at issue. Comcast further requests that the Director be assessed fees and costs pursuant to N.J.S.A. 54:51A-22.
The Director opposes Comcast’s motion for summary judgment and has filed a cross-motion for summary judgment claiming that Comcast is not entitled to an exemption from sales and use tax for its purchase and use of converters and remotes on the basis that the primary purpose of the converters was security, not the transmission of television information, and that the remotes did not transmit television information. The Director also claims that Comcast must pay tax amnesty penalties assessed on its “agreed”[3] and paid liabilities, as well as any tax now adjudicated *83 due for converters and remotes because this penalty cannot be waived for amnesty eligible sales and use tax liabilities. The Director requests late and underpayment penalties because Com-cast lacked good cause in its failure to pay the taxes at the time they were due.
At oral argument on November 7, 2012, the parties requested that the court reserve its decision on the issue of the amnesty penalties until such time as the Superior Court Appellate Division renders a decision in its review of United Parcel Service v. Director, Division of Taxation, 25 N.J.Tax 1 (Tax 2009).[4] The court agrees to this request.
As to the remaining issues, this court finds that the matters in dispute are issues of law and not of fact. Accordingly, resolution by summary judgment is appropriate.
For the reasons set forth below, the court grants Comcast’s motion for summary judgment as to the exemption of the converters from sales and use tax. The court also grants partial summary judgment to the Director as to the assessment of sales and use tax for the remotes and to any associated late fee penalties. Comcast’s request for fees against the Director is denied.
I. STATEMENT OF FACTS
Comcast is a provider of cable television program services in New Jersey. According to the Comcast University Student Manual (“Comcast Student Manual”),[5] Comcast’s cable network was comprised of a head end (received and processed a signal from satellites and other sources), a transportation system (transported the signal from the head end to the community), a distribution system (carried the signal within the community on cables strung between utility poles or buried underground to a location outside a *84 customer’s building, known as the “tap”) and a drop system (transported the signal into a customer’s location) during the periods at issue (July 1,1997 through June 30, 2001).
The Comcast Student Manual explained that the drop system started at the tap, which is the end of the distribution system, and terminated at the customer’s terminal device, namely a converter, television, VCR or computer. Depending on the service and equipment at the customer’s location, some customers required Comcast to supply terminal equipment in order to receive the transmission from the cable. Analog converters, digital converters and cable modems were supplied by Comcast via lease agreements and were to be connected to the cable wire at the customer’s location. It is Comcast’s purchases of customer-leased converters[6] and remotes that are at issue in this case.
Based on federal regulations, the converters and remotes were categorized as machinery, apparatus or equipment for tax purposes. For federal and New Jersey income tax purposes, Com-cast classified converters and remotes as assets that were capitalized and depreciated over an anticipated multi-year useful life[7] rather than as expense items to be deducted in the year of purchase.
In order to reach the customer, the cable signal traveled along the coax cable running underground or along utility poles from the cable line in the street to the customer’s location. The cable signal then ran through the wiring inside the customer’s location to the converter. The cable signal was then processed by the converter, which converted the signal from the frequencies at which the signal was transmitted to the frequencies for the channel to which the customer’s television was tuned. The con *85 verter then transmitted the signal through a coax (via radio frequency) or other cable (via baseband) to the customer’s television.
The cable signal (also known as the radio frequency) discriminated one channel from another based on frequency. A tuner located within the converter would receive a command from the customer to go to a certain channel and the tuner would then go to that particular channel and convert the channel signal to a common frequency band.
A. Converters
As stated above, the converters purchased by Comcast were used to convert a television signal from the frequency on which the signal was transmitted to the frequency for the channel to which the customer’s television was tuned. Typically, the conversion process is initiated by the reception of an infrared signal from a remote. The customer (via the remote) instructed the converter as to what action or function they wanted the converter to perform and that instruction communicated with the hardware and software in the converter to initiate the execution of that command.
Upon receipt of the command, the software triggered the tuner and initiated the process of executing the command. The tuner processed, received and started the conversion of the original command to the picture or frequency displayed on the television screen.
An analog converter converted analog television signal to the frequencies viewable on a customer’s television. The converter was directed to a specific channel either by manual entry using the control buttons on the front of the converter or through use of a remote in which the converter received an infrared signal from the remote. The converter then set its analog tuner to that channel and converted said channel to an immediate frequency. Next, the converter demodulated that channel (i.e., it removed the signal from the carrier waves). If the signal was scrambled, the convert *86 er de-scrambled the signal so that it could be viewed by the customer.[8]
Finally, the converter transmitted the signal to the customer’s television and re-modulated the signal to the frequency for the channel to which the customer’s television was tuned and then transmitted a radio frequency signal to the customer’s television through the coax cable connector on the back of the converter.
The non-addressable analog converters purchased by Comcast were not able to send or receive any specific communications from the head end. However, the addressable analog converters purchased by Comcast were able to send information to and receive information (such as the authorization code for a premium channel) from the head end.[9]
Comcast also purchased digital converters. A digital converter converted analog and digital television signals to frequencies that were viewable on the customer’s television. To begin the conversion of a digital signal, the converter was directed to a specific channel either through manual entry using the control buttons on the converter or by receiving an infrared signal from the remote. The converter then set its digital tuner to that channel, converted it to an immediate frequency and demodulated that channel. If the signal was encrypted, the converter decrypted the resulting signal[10] so that it could be viewed by the customer. The converter decoded the signal and converted the digital signal to an analog signal that could be received by the customer’s television. Finally, the converter transmitted the analog signal to the customer’s television, demodulated the signal to the frequencies for the channel to which the television was tuned and transmitted a radio *87 frequency signal to the customer’s television. The digital converters were also addressable and could send information to and receive information from the head end.
The entire conversion process for both analog and digital converters took less than one second. When turned on, converters were always converting an incoming signal and transmitting that signal to the customer’s television on baseband as well as on the channel to which the television was tuned.[11]
In addition to converting incoming signals, Comcast’s converters performed other functions, such as providing a cable television guide,[12] parental controls and near video on demand. The cable television guide could not be viewed by customers without a converter, even if those customers had a cable-ready television.
To implement parental controls, the converter either blocked content entirely using scrambled signals (similar to technology used to restrict access to premium channels) or allowed access to certain programs. Access to the blocked channels could only be achieved through a customer entering a password with a remote.
Near video on demand (marketed by Comcast as “In-Demand” video) allowed customers to pay for video programming that was transmitted on a particular channel at a specific time. During the periods at issue, an addressable converter was necessary if a customer wanted to purchase and view near video on demand programs. The purchase of the near on demand programming was almost instantaneous and the authorization occurred “within minutes.” [13]
*88 Comcast transmitted channels 2 through 13 at the same frequencies as the broadcast television channels and, as a result, non-cable-ready televisions could tune into cable television channels 2 through 13 without a converter. Non-cable-ready televisions could not tune into channels transmitted in Mid Band, Super Band or Hyper Band without a converter. Non-cable-ready televisions could not receive digital channels, the cable television guide, scrambled channels, near video on demand or music choice without a converter. They also could not utilize Comcast’s parental controls.
Cable-ready televisions, depending on make and model, could tune into channels 2 through 13, as well as certain channels in Mid Band, Super Band and Hyper Band. Different models of cable-ready televisions had different channel capabilities ranging from approximately twenty to more than eighty channels; however, a converter was required to access digital channels, the cable television guide, scrambled channels, near video on demand, music choice and parental controls. Therefore, Comcast converters essentially had the same function whether a customer had a cable-ready television or not.
If a customer with a non-cable-ready television desired only the basic thirteen traditional broadcast channels and did not want any additional channels or functions such as the cable guide, parental controls or near video on demand, a converter was not needed. Similarly, if a customer had a cable-ready television and did not want analog channels outside that television’s capabilities, digital *89 channels, the cable television guide, parental controls or near video on demand, the customer would not need a converter.
B. Remotes
Comcast remotes were used to interact with the converter in order to control specified functions. A remote sent a command to the converter using an infrared signal that directed the converter to tune, convert and transmit the signal for a specific channel. The remote itself did not transmit television information — it simply communicated commands to the converter via an infrared signal. The infrared signal is modulated to interact with the converter’s software thereby initiating the function capabilities of the converter.
During the periods at issue, Comcast remotes were distributed with a converter and were programmed to function with that particular converter. Remotes served the same function as the control buttons located on the front of the converter by causing the converter to convert a specific channel and to transmit specific information or programming to the customer’s television. Remotes also enabled the customer to access the cable television guide, order near video on demand and access Comcast’s parental controls.
A customer who desired access to Comcast’s parental controls could only do so with a remote because the parental control application required a numeric password using the keypad on the remote.[14] Remotes also had the ability to be programmed to control the volume on a customer’s television set and to turn the television on and off. Use of the remote required that it be operated in the same room as the converter and had to be located within the line of sight of the converter to be able to send a signal that the converter could receive. The process by which the remote sent the signal to the converter to change the channel was *90 nearly instantaneous with the conversion and transmission process.
All customers who desired and subscribed to a level of service that required a converter were provided with both a converter and a remote. The specific type of converter (analog or digital) that was supplied to a customer depended on the level of the customer’s cable subscription.
C. The Audit
The Director commenced its audit of Comcast on September 17, 2001. On August 20, 2002, the Director’s auditor mailed a first set of use tax work papers to Comcast. The letter made no specific reference to Comcast converters or remotes or their use in transmission of television signal. In July 2003, the Director issued Notices of Assessment that assessed use tax against Com-cast. The assessed use tax was based on six percent of the price of the converters and remotes purchased by Comcast.
The Director’s use tax assessment was based on a position enunciated in a February 2001 notice mailed to all cable companies, which provided in relevant part:
The statutory exemption for providers of “cable/satellite television program services” is applicable to equipment used in producing cable television programming or in transmitting or distributing cable television programming to cable television sendee providers. It does not apply to equipment purchased or used by cable television service providers that receive programming from other sources, which is then redistributed to cable television subscribers and customers. Cable television sendee providers are those companies that are subject to the provision of N.J.S.A 48:5A-1 et seq.
Comcast challenged the Director’s use tax assessment with the Conference and Appeals Branch. On December 11, 2003, the Director’s Final Determination was upheld. On March 8, 2004, Comcast filed complaints with the Tax Court and on May 10, 2004, the Director filed answers to those complaints.
During the same time period, similar complaints were filed by another cable television company, RCN, and its various entities. RCN of New Jersey, Inc. v. Dir., Div. of Taxation, 23 N.J.Tax 22 (Tax 2006) (“RCN I ”); RCN Telecom Services, Inc. v. Dir., Div. of Taxation, 23 N.J.Tax 520 (Tax 2007) (“RCN II”). The Di *91 rector and Comcast made the decision to withhold the filing of motions until the conclusion of the RCN litigation in the hope that it would provide the necessary guidance in the Comcast matters.
Discovery was exchanged between the parties and from August 2005 through March 2006 there were multiple attempts to schedule a meeting to facilitate the establishment of a framework for determining which machinery, apparatus and equipment purchased by Comcast were used “directly and primarily in the production or transmission of radio or television information,” the standard enunciated in N.J.S.A. 54:32B-8.13(e).
Through documents filed in RCN I, Comcast learned on March 15, 2006, that the Director had abandoned the position enunciated in its February 2001 Notice. On March 24, 2006, this court issued an opinion holding that a cable provider’s purchase of cable wiring was exempt under the Sales and Use Tax Act. RCN, supra, 23 N.J.Tax at 29.
In May 2007, this court issued its decision in RCN II, holding that RCN’s purchase of converters was exempt from tax under N.J.S.A. 54:32B-8.13(e) on the basis that the converters were directly and primarily used in transmitting television information. Supra, 23 N.J.Tax at 525. Shortly after the opinion was issued in RCN II, the Director asserted an alternative sales tax assessment against RCN. In August 2007, RCN filed a motion to bar the Director from making new claims asserting sales tax on RCN’s customer equipment charges as a way of supporting the Director’s use tax assessment on RCN’s purchase of converters. On November 15, 2007, this court heard the motion and signed an order barring the Director’s assertion of new claims.[15] No appeal was taken.
After considering the decisions in the RCN cases, the Director and Comcast negotiated a partial stipulation of settlement and in October 2008 Comcast issued checks for the agreed tax and interest in accordance with the Director’s September 19, 2008 *92 computations. As part of that settlement, the Director abated all late payment penalties for the amounts paid under that stipulation. The parties did not resolve the issue of whether the 5% 2002 amnesty penalty[16] should be applied to the amounts paid under that settlement. Comcast’s cheeks were accepted by the Director on March 29, 2009 and a stipulation of partial settlement for each Comcast entity was filed with the Tax Court on June 12, 2009.
The issues not covered by the stipulation of partial settlement deal primarily with the assessment of taxes on Comcast’s converters and remotes. After an additional two year period of contentious discovery, both parties concur that there is no dispute with regard to the material relevant facts and both parties now move for summary judgment.
II. LEGAL ANALYSIS
A. Summary Judgment
Under R. 4:46-2, summary judgment is appropriate when:
[T]he pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.
[R 4:46 — 2(c).]
Summary judgment is proper when “a discriminating search of the merits in the pleadings, depositions and admissions on file, together with the affidavits submitted on the motion clearly shows not to present any genuine issue of material fact requiring disposition at a trial.” Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 75, 110 A.2d 24 (1954) (citing Bernard L. Shientag, Summary Judgment, 4 Ford. L.Rev. 186 (1935)).
In Brill v. Guardian Life Insurance Co. of America, the New Jersey Supreme Court emphasized the importance of summary judgment “not only to save antagonists the expense of protracted *93 litigation but also to reserve judicial manpower and facilities to cases which meritoriously command attention.” 142 N.J. 520, 542, 666 A.2d 146 (1995) (quoting Robbins v. Jersey City, 23 N.J. 229, 240-241, 128 A.2d 673 (1957)).
Both parties have conducted extensive discovery and have stipulated to the relevant facts. The parties move as a matter of law for summary judgment in their favor and the court upon considering the moving papers and oral argument concludes that there are no material facts in dispute and the matter is appropriately resolved through summary judgment.
B. Exemption of Converters
Comcast argues that its converters and remotes were statutorily exempt from taxation and cites N.J.S.A. 54:32B-8.13 as being controlling on this issue. This statute provides in pertinent part:
Receipts from the following are exempt from the tax imposed under the Sales and Use Tax Act:
e. Sales of machinery, apparatus or equipment, ... which have a useful life exceeding one year, ... to a provider of cable/satellite television program services ... for use or consumption directly and primarily in the production or transmission of radio or television information transmitted, delivered or archived through any medium or method.
The exemptions granted under this section shall not be construed to apply to sales, otherwise taxable, of machinery, equipment or apparatus whose use is incidental to the activities described in subsections a., b., c., d. and e. of this section.
The exemptions granted in this section shall not apply to energy, motor vehicles, or to parts with a useful life of one year or less or tools or supplies used in connection with the machinery, equipment or apparatus described in this section.
[N.J.S.A. 54:32B-8.13.]
A taxpayer “who claims exemption from a tax must bring himself clearly within the exemption provisions.” L.B.D. Constr., Inc. v. Dir., Div. of Taxation, 8 N.J.Tax 338, 353 (Tax 1986) (citing Container Ring v. Dir., Div. of Taxation, 1 N.J.Tax 203, 208 (Tax 1980), aff'd o.b., 4 N.J.Tax 527 (App.Div.1981), certif. denied, 87 N.J. 416, 434 A.2d 1090 (1981)). Generally, statutes granting exemption from taxation are strongly construed against those seeking exemption. Mal Bros. Contracting Co. v. Dir., Div. *94 of Taxation, 124 N.J.Super. 55, 61, 304 A.2d 750 (App.Div.1973), certif. denied, 63 N.J. 554, 310 A.2d 469 (1973) (citing Bloomfield v. Acad. of Med., 47 N.J. 358, 363, 221 A.2d 15 (1966)).
A detailed analysis of the legislative history of N.J.S.A. 54:32B-8.13(e) was conducted by the court in RCN I. Supra, 23 N.J.Tax at 24-25. At issue in RCN I was whether cable was exempt under N.J.S.A. 54:32B-8.13(e). The court determined that the “legislative history provides limited guidance as to the proper interpretation of Section 8.13(e), as amended, with respect to the issue of whether cable qualifies for the statutory exemption.” Id. at 25-26. Canons of statutory interpretation may be utilized when the language of the statute is not facially clear and no authoritative indication of legislative intent is provided by the legislative history. Id. at 26. In interpreting N.J.S.A. 54:32B-8.13(e), the court applied four general principles of statutory interpretation:
The court should attempt to determine the legislative intent in enacting particular legislation. [2.] Legislation should be interpreted in the context of related statutes. [3.] The “plain meaning” of a statute does not foreclose further analysis in light of the legislative purpose, the context of the statute, and the history of the statute____[4.] Statutes should be interpreted sensibly in order to effectuate the legislative objective.
[RCN I, supra, 23 N.J.Tax at 26 (citation omitted).]
Ultimately, the court determined that the legislative intent of N.J.S.A. 54:32B-8.13(e) provided an exemption from tax of cable purchased by a cable television services provider. The cable had a useful life exceeding one year and was used “directly and primarily in the production or transmission of television information transmitted, delivered or achieved through any medium or method.” RCN I, supra, 23 N.J.Tax at 28.
A year later, this court was called upon to determine if RCN’s converters[17] were also exempt under the statute. In RCN II, the Director contended that the converters were not used “directly and primarily” in the transmission of television information because RCN’s subscribers could obtain basic cable service without the use of a converter. Supra, 23 N.J.Tax at 525. The court was *95 required to analyze both the function and use of a converter and to interpret the statutory phrase “directly and primarily.” Id. at 523. The court laid out four principles to follow when interpreting a statute if an exemption is being claimed:
First, exemptions are to be construed narrowly, but the interpretation should not distort the statutory language. Second, the taxpayer has the burden of establishing that it qualifies for the exemption it seeks. Third, under the Act, sales and use tax presumptively is payable. Fourth, the Director’s assessment is presumptively correct.
[Id. at 523-524 (citations omitted).]
Using these principles, the court interpreted the phrase “directly and primarily” in N.J.S.A. 54:32B-8.13(e) as “limiting the exemption ... to purchases of apparatus or equipment used only for receiving or transmitting interactive telecommunications service or for the transmission of television information.” Id. at 524. The court determined that any apparatus “not so used, even if essential or necessary for, or integral to, the operation of a cable television system and service, will not qualify for exemption.” Ibid.
Applying this interpretation to a converter, the court accepted the definition of a converter as:
A device with a useful life greater than one year that connects to a television and some external source of signal and turns the signal into content that is displayed on the screen. A device that resides in a customer location and is used as an interface between the cable system network and the customer’s television. [Converters] are used to decode or decrypt encoded or decrypted encoded or encrypted video content so that the consumer can view the content when authorized. [Converters] also allow access to video on-demand programming, allow for implementation of parental controls and allow for the viewing of digital content on analog TV sets, among other things.
[Id. at 525.]
Utilizing this definition of a converter, the court concluded that, when in use, converters were used directly and primarily in the transmission of cable television signals and noted that “the motion papers demonstrate no other function for the boxes.” Ibid.
In addressing Comcast’s purchase of converters, the Director asserts that unlike in the RCN cases, there is credible evidence in the record to demonstrate that the converters had other functions in addition to the transmission of television information. The *96 Director points to evidence discovered in the Comcast litigation not available in the RCN cases to assert that the security function, not transmission, was the primary function of a converter. Specifically and most importantly, the Director points to the classification of a converter as a “Signal Security Device” in the Comcast University Manual.[18]
While not bound by the RCN I and RCN II decisions, this court concurs with and accepts the statutory analysis and definition of a converter as described in the RCN cases, but rejects any notion that in order to be exempt a converter must have had only the singular function of transmission. This court finds that the exemption can be available to devices with multiple functions as long as the primary purpose and function of the device was the transmission of television information. The court finds that a converter’s non-transmission functions highlighted by the Director were secondary and incidental to the transmission function. The court does not accept that the legislative intent of N.J.S.A. 54:32B-8.13(e) was to provide for an exemption to machinery, equipment or apparatus with only a solitary and exclusive function, thereby barring devices with multiple functions.
While the Comcast University Student Manual clearly identified a converter as a signal security device, this designation does not change the fact that the converter was a transmitter of television information. The court accepts as fact that Comcast did use converters to gate-keep against the pirating of their cable service, process pay-per-view billing, provide access to parental controls and cable channel guides, and to poll use and trends by customers of viewing content and preferences. Additionally, this court finds that these functions did not meet the narrow definition of trans *97 mission of television information as set forth in N.J.S.A 54:32B-8.13(e).
The Director’s argument that these other functions (particularly the security function) were primary to the transmission function of a converter is illogical. The use being “secured” by the converter was the transmission itself. The transmission function must be the primary function of the converter as it was the basis for the need and use of the other functions, which the court finds were secondary in nature. When in use, the converter’s primary purpose was transmission.
Accordingly, this court finds that the converters were exempt from sales and use tax pursuant to N.J.S.A 54:32B-8.13(e) for the period at issue.
The Director also argues that if this court finds that some of the converters were for the direct and primary purpose of transmitting television information within the meaning of N.J.S.A. 54:32B-8.13(e), then Comcast bears the burden of proving plaintiff by plaintiff, converter by converter, remote by remote, tax quarter by tax quarter and lease by lease which converters and remote controls were deployed consistent with this exemption. This court finds said argument to simply not be a plausible, reasonable or a rational means of determining taxation and without support in the law. Comcast has met its burden of proof that its converters were primarily and directly used in the transmission of television information. This finding is sufficient for the entitlement of the exemption.
C. Exemption of Remotes
The court now examines the use of Comcast’s remotes that were supplied -with the converters. At his deposition, Mark Hess, Comcast’s Vice President of Digital Television during the period at issue, explained that a remote was a device that sent an infrared signal to the converter, which then communicated a command to the tuner. He stated that “the remote control can’t tune anything. The remote control simply sends a signal to the [converter] so it can then tune, convert and transmit the signal to the television.”
*98 As described, remotes were essentially functional interface devices and by definition were not used directly and primarily in the transmission of television information. Remotes communicated by infrared signal and neither television information nor cable signals passed through the remote. Remotes, while convenient and arguably necessary, were not part of the transmission process.
Remotes could be used to activate and operate a television, including the selection of a channel and volume control. Remotes were also necessary to activate parental controls and to access a cable television guide. None of these functions involved the passing of television information through the remote to the converter. Comcast’s own witnesses testified that remotes, while used for operation of the converter, were not required to receive the television information because customers could operate a converter manually. Remotes were therefore not part of the transmission process and were completely distinguishable from converters and the cable wires in RCN I, which were found to be a conduit in the transmission process. The court also notes that nowhere in the Comcast University Student Manual was there a reference to remotes being part of the cable system.
The court finds no basis to conclude that the legislature intended to exempt remotes from taxation. Thus, this court finds that Comcast’s purchase and use of remotes did not meet the statutory exemption under N.J.S.A. 54:32B-8.13(e) and therefore it was not exempt from taxation on remotes purchased during the relevant periods at issue.
D. Late Payment Penalties
The Director correctly argues that all taxpayers are charged with knowledge of New Jersey law, statutory and otherwise. E.g., Amplicon, Inc. v. Dir., Div. of Taxation, 18 N.J.Tax 129, 135-136 (Tax 1998). N.J.S.A. 54:32B-26 advises taxpayers that the penalties found in the State Uniform Tax Procedure Law, N.J.S.A. 54:48-1, et seq., applies to outstanding sales and use tax:
Any person failing to ... pay over any tax to the director within the time required by this act shall be subject to such penalties and interest as provided in ... 54:48-1 *99 et seq. Unpaid penalties and interest may be determined, assessed, collected and enforced in the same manner as the tax imposed by this act.
[N.J.S.A. 54:32B-26.]
N.J.S.A 54:49-6(a) directs that the Director “shall assess” additional taxes, penalties and interest for tax “deficiency assessments.” N.J.S.A. 54:49-4 imposes additional penalties for late filing, late payment and underpayment. If a required tax is underpaid, 5% of the underpayment will be added to the tax unless the underpayment is shown to be due to reasonable cause. N.J.S.A 54:49-4(a). Viewed together, N.J.S.A 54:49-4 and -6 reflect a legislative intent for imposition of late payment penalties.
N.J.S.A. 54:49-11(a) allows the Director to remit or waive late payment penalties under certain circumstances where the taxpayer’s failure to pay taxes when they are due can be explained to the satisfaction of the Director. A regulation incorporating this waiver provides in part:
(a) If the failure to pay any tax when due or the failure to file any return is explained to the satisfaction of the Director, he or she may abate the payment of the whole or any part of any penalty ... Pursuant to N.J.S.A. 54:49-11(a), after July 1, 1993, the Director may remit or waive the payment of the whole or any part of any penalty ... with respect to deficiency assessments made pursuant to N.J.S.A. 54:49-6.
(b) An abatement will be granted if the taxpayer can show reasonable cause for failure to file any return or pay any tax when due and makes full payment of the taxes when due.
[N.J.A.C. 18:2-2.7.]
N.J.A.C. 18:2-2.7(d)(1) also provides as a basis for waiver “an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer.”
The Director’s exercise of discretion to waive or abate penalties under N.J.S.A 54:49-11(a) and N.J.A.C. 18:2-2.7(d)(1), although entitled to deference, remains subject to court review.
In reviewing an administrative section it is well settled that “courts are not free to substitute their judgment as to the wisdom of a particular administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable.” The statute under consideration delegates authority to the [D]irector to determine whether under particular circumstances penalty or interest should be remitted or waived. In fact its terms grant the [Djirector considerable discretion. Under such circumstances, [the Director’s! actions should not be overturned unless they are manifestly corrupt, arbitrary or misleading.
*100 [United Parcel Services, supra, 25 N.J.Tax at 49 (quoting Media Graphics, Inc. v. Dir., Div. of Taxation, 7 N.J.Tax 23, 33 (Tax 1984) (citations omitted) aff'd, 8 N.J.Tax 321 (App.Div.1986)).]
Comcast argues that it had reasonable cause for not paying tax on its purchases of remotes because Comcast’s position was based on the plain meaning of N.J.S.A. 54:32B-8.13(e). In support of this position, Comcast cites the Director’s subsequent agreement that cable television companies are eligible for the exemption under N.J.S.A. 54:32B-8.13(e) as eable/satellite television program service providers (which was the basis for the Director’s February 2001 Notice and the Director’s assessment against Comcast). Comcast also points to the decisions in RCN I and RCN II.
The court concludes that the Director acted reasonably in refusing to abate or waive late payment penalties with respect to the taxes due on the remotes. Regardless of the Director’s position regarding cable television service providers and of the court’s decisions in RCN I and RCN II, remotes did not by definition meet the eligibility requirements of N.J.S.A. 54:32B-8.13(e). This was at all times within the knowledge of Comcast, as the absence of a transmission function was testified to by Com-cast’s own witnesses. Additionally, as noted, the remotes were not referenced in the Comcast University Student Manual as a part of the cable system. If Comcast had any concerns regarding an exemption, it could have made an inquiry to the Director. Comcast’s misunderstanding or misjudgment is not good cause for its failure to pay taxes on these devices and the Director’s assessment of late and underpayment penalties was reasonable and within his discretion.
E. Litigation Costs
The court considers Comcast’s request for reasonable litigation costs pursuant to N.J.S.A. 54:51 A-22. This statute provides that a prevailing taxpayer may be awarded a judgment or settlement for reasonable litigation costs not to exceed $15,000. N.J.S.A. 54:51A-22(a). A “prevailing taxpayer” is defined as one who establishes that the position of the State was without reasonable basis in law or fact as determined by the court. Ibid. This *101 court does not find that the Director’s position was without reasonable basis in law or fact. The court’s determination that remote controls were not exempt and were thus subject to sales and use tax is sufficient justification for this determination. Additionally, the Director provided sufficient evidence regarding other non-transmission functions of the converters not available in the RCN cases that justified additional review by the court. Accordingly, no taxpayer relief under this statute is awarded.
F. Alternative Sales Tax
Finally, the court observes that the original moving papers filed by Comcast included within them an argument anticipating that the Director would attempt to assert an alternative sales tax not collected on its contracts with its customers, similar to what occurred in RCN II. The factual contention is that Comcast was renting and not leasing its equipment and therefore sales tax should have been collected from the customer. N.J.S.A. 54:32B-12 explains the statutory presumption that the incidence of sales and use tax falls to a vendor if tax due under the Act is not paid, self-assessed or collected and remitted from a customer. N.J.S.A. 54:32B-14(b) authorizes the remittance of otherwise unpaid sales tax.
The Director’s moving papers disputed Comcast’s argument to bar any anticipated alternative sales tax but in its cross motion for summary judgment the Director did not assert any argument based upon the alternative sales tax.
At oral argument, counsel for Comcast stated that the Director had abandoned the alternative sales tax position. Counsel for the Director did not offer any response to this and did not raise the issue of alternative sales tax in her argument.
For the purpose of completeness, efficiency and closure, the court finds that the Director is barred from asserting an alternative sales tax assessment. The Director appears to have abandoned this argument but for purposes of clarity the court finds that the customer contracts were in fact leases of equipment and not rentals and therefore not subject to alternative sales tax.

 The plaintiffs in these consolidated matters and the relevant periods at issue are as follows: Comcast of South Jersey, Inc. (April 1, 1999 to June 30, 2001); *82 Comcast of Northwest New Jersey, LLC (July 1, 1997 to June 30, 2001); Comcast of the Meadowlands, LLC (July 1, 1997 to June 30, 2001); Comcast Cablevision of Southeast Pennsylvania, Inc. (April 1, 1999 to March 31, 2000); Comcast of Monmouth County, LLC (July 1, 1997 to June 30, 2001); Comcast of New Jersey, II, LLC (July 1, 1997 to June 30, 2001); Comcast of Jersey City, LLC (July 1, 1997 to June 30, 2001); Comcast of Gloucester County, LLC (July 1, 1997 to June 30, 2001); Comcast of Ocean County, LLC (July 1, 1997 to June 30, 2001); Comcast of Garden State, LP (July 1, 1997 to June 30, 2001); Comcast of Plainfield, LLC (July 1, 1997 to June 30, 2001); Comcast of Central New Jersey, LLC (July 1, 1997 to June 30, 2001); Comcast of Burlington County, LLC (July 1, 1997 to June 30, 2001); Comcast of Mercer County, LLC (July 1, 1997 to June 30, 2001). Note that some of the above named entities are successors to the entities that existed during the periods at issue.

 The terms "converters” and "set-top boxes" are used interchangeably by both parties in their respective pleadings and in documents produced in discovery. For purposes of this motion the court will refer to these items as "converters.”

 Between December 2007 and October 2008, Comcast and the Director reached a partial settlement. The 2002 amnesty penalty for the amounts paid pursuant to that settlement remains in dispute.

 Appellate Division docket number A0000940-10. The appellate panel heard oral argument on October 31, 2012. As of the date of this decision, no opinion has been entered by the Appellate Division in this matter.

 All references to the Comcast University Student Manual will be to Edition 1 — May 2001.

 Comcast states it purchased 0.49% non-addressable analog converters, 21.45% addressable analog converters and 78.05% digital converters.

 All of the converters and remotes were powered by battery. Therefore, changing the battery when necessary would extend the useful life of the converter or remote for several years absent defect or damage. For depreciation purposes, Comcast applied a three to five year useful life to its converters and remotes.

 Certain analog signals were scrambled at the head end through altering the synchronization signals; those scrambled signals were then transmitted to the customer's premises.

 The head end was the control center of a cable television system where broadcast signals were received and distributed.

 Certain digital signals were encrypted at the head end and then transmitted through the cable plant to the customer’s premises.

 The only exception is the tew seconds that it took for a converter to warm up when it was turned on.

 The cable television guide allowed customers to view a list of programs showing on various channels. The guide was transmitted as a radio frequency signal from the head end to the converter and then processed by software in the converter to create the guide display graphics transmitted to the customer’s television.

 The conversion function for near video on demand programming was the same as the conversion function for other cable television programming. Com- *88 cast was able to transmit data to every addressable converter using a radio frequency. That function was known as a "global hit.” Global hits were used to initiate code downloads (e.g. update the guide software) or to authorize a level of service (e.g. add a channel to a "tier” of service). Global hits occurred quickly to avoid any disruption to customers. Comcast was able to do this by sending a signal to an addressable converter causing a soft disconnect of a customer's cable service. The soft disconnect was effected through a signal from the head end that deactivated a particular addressable converter. Comcast was also able to "poll" its addressable converters to see if customers had ordered pay-per-view programming through those converters. A customer’s ordering information was then transferred to the billing system and the customer was charged for any purchases.

 Only use of a remote would provide access to parental controls because converters did not have a keypad and it was thus impossible to enter the numeric password necessary to gain access to the parental controls.

 The Order was submitted in Comcast’s Certification of David J. Shipley, Esq. and can be found at Comcast Doc. 6257-58.

 New Jersey offered amnesty to taxpayers for tax returns due from January 1, 1996 through December 31, 2001. The 2002 amnesty program included a 5% penalty under N.J.S.A. 54:53-18(b) to be imposed on taxpayers owing taxes during that period who did not take advantage of the program.

 Converters are referred to as "set-top boxes” in the RCN cases. As discussed supra N.2, this court views the terms as interchangeable.

 Comcast Doc. 3642. At oral argument, counsel for the Director argued that this was the singular reference to a converter in the student manual. However, this is inaccurate because the converters were referenced as a component of the drop system and noted to be company-supplied equipment necessary for changing the frequency of a television signal, allowing customers to tune to desired regular and scrambled television channels and to allow the reception of digital television services. Comcast Doc. 3639.